All right. Our third case for today is United States v. Robert Luce. Mr. Shapiro. Thank you, Judge, and may it please the Court. Michael Shapiro on behalf of the appellant, Robert Luce. Although we raise a number of issues in our brief, there are two primary I would like to address today, causation and materiality, starting first with the causation issue. The facts of this case illustrate in a very real way how the choice of a causation standard can affect the outcome in a False Claims Act case. This case was based on two annual forms in the insured loan context. The district court itself concluded that those forms did not result in any loans defaulting. Well, but I guess I want to just tweak what you said a little bit because as I understand it, what the district court said was at the threshold program eligibility level, Mr. Luce's failure in the 2006 form to indicate that he had been indicted in 2005 for various types of fraud certainly affected his ability to have his company, MDR, continue in this program because HUD would have looked at the criminal information and the language is quite clear. At the next level down, did his failure to reveal this mean that somebody didn't lose their job and default on their mortgage? No. It wasn't connected. The job for us is to decide whether we should look at the threshold and say, but for Luce's failure to disclose, as he should have done, we wouldn't have had this company in the market at all. We don't know if these borrowers would have gone to somebody else, whether they would have skipped the idea of purchase altogether. We just don't know, but we do know that this is what was necessary for the first step. Yes, Judge, and I think something you just said touches on why the choice of a causation standard is so important here. You're obviously speaking in terms of but for, but for Mr. Luce signing this form, MDR would not have been operating. There's two problems with that. Well, which is what this court has followed for many years in terms of the test. Yes, and that was the test set by this court in First National Bank of Cicero. I think now is an appropriate time to revisit that decision for several important reasons. The first is looking at the instructions from the Supreme Court just last year in the Escobar case. You say that about Escobar, but I went back and looked at Escobar a couple of times, and it's certainly true. The Supreme Court a couple of times, almost in passing, says, you know, well, we should look at, you know, for example, over here. This is what page? Around page 19999, Congress intends to incorporate well-seen, well-settled meaning of common law terms, but Escobar isn't about the causation standard. Escobar is about materiality.  That's not really addressed at all other than this offhand reference to the common law. I wouldn't call it an offhand reference to the common law. I would look at what the Supreme Court said there, and it wasn't just, oh, we acknowledge that there are common law fraud standards out there. When you look at the language in Escobar, I believe it says, we presume common law standards apply unless they are not consistent with the statutory text of the FCA. They say, we presume. It's a presumption, and I think that's a pretty powerful statement by the Supreme Court because we're starting in a place where the presumption is that the common law elements of common law fraud are going to apply unless they are not consistent with the statute. But you're implying that this Court's standard, looking at that threshold of eligibility, is actually inconsistent with Escobar, and I just can't find anything in there, and I don't think it answers the question, what was Congress concerned about with the False Claims Act? Surely an agency is entitled to have upfront screening about who's able to get money from its programs. I have no disagreement with that statement, Judge Wood. I think what you're looking at here is, when does a regulatory violation cross the line into conduct that can rise to the level of a False Claims Act violation? You can obviously have both a regulatory violation and a False Claims Act violation based on the same facts in any given case. And there could be many regulatory violations that would not. If you used the wrong version of the form or if you forgot your most recent address or something like that, I mean, I've filled out my share of giant government forms, and many of them, it seems, are details that you try to get right but would not be regarded as material by somebody if you got them wrong. But this is the centerpiece. I mean, as the government points out, this is a program under which the United States underwrites these or backs up these mortgages. And so we have a real moral hazard problem from a law and economics point of view, and we need to address that by these upfront disclosures. And there's no question that the government was entitled to have those sorts of upfront disclosures. There's two questions. And it didn't get them, and it lost a lot of money. It underwrote a lot of mortgages that it wouldn't have underwritten. Well, I think you have to also remember the fact that over 95% of the loans at this case were reinsuring from one government-insured loan or refinancing, I'm sorry, from one government-insured loan to another. So in over 95% of the loans at issue here, the government was already on the hook of these, and Mr. Luce did nothing to increase the risk of any defaults or the risk of any loss to the government. Mr. Fitzgerald. Judge Roper and then Judge Ripple. Why isn't the evidence that the government took action immediately upon learning of the misrepresentation to investigate and institute debarment proceedings strong evidence that the certification was material? Well, I think you have to look at what kind of action the government took. It did move to debar Mr. Luce, but the government, in a deposition by HUD Executive Julie Schaefer, stated that the government could have declined to insure loans where it believed fraud was involved. The government took no such action there. The government had immediate regulatory actions to take against both MDR and Mr. Luce. Instead, what the government did was for six months approve insurance on hundreds of new loans from that point forward. So a reasonable jury could ask how important was this representation to the government when it allowed itself to be on the hook as an insurer for hundreds of new loans following full disclosure of the facts about Mr. Luce's V-forms and his unrelated criminal case. Mr. Shapiro, as I understand it, there is a split in the circuits on this causation question. There is. Can you give me an idea of about how many circuits go each way? Sure. There are four circuits that have come out on the side of proximate causation. To my knowledge as of today, and I checked again last week, I believe the Seventh Circuit is the only circuit that applies but for causation. So we're the outlier. The Seventh Circuit is the outlier. Assuming that you're correct that at least Escobar throws at least a cross light on this case, your argument is that the proximate cause test would be closer to the common law. Yes, sir. And that we should not, in effect, assume that Congress meant to adopt a construction which is in derogation of the common law. That's correct. I don't believe there's any dispute in this case that common law fraud principles require the application of proximate causation and to recover damages. How would proximate causation play out in your case with this defendant? So how it would play out here, Judge, is you would have to look at whether the damages the government claims, and those are the payments it made as a result of loan defaults and the insurance on them, whether those payments were the reasonably foreseeable consequence of Mr. Luce's representation on the v-forms, specifically looking at the character and the nature of that representation. And there is nothing in the representation about Mr. Luce's unrelated criminal proceedings that made a loan more likely to default. This is where I think it's appropriate, even though these cases did not directly address whether proximate causation should apply, when you look at the facts in cases like anchor mortgage and dolphin mortgage. There you have representations in order to obtain a government-insured loan that were about things like a borrower's income, a borrower's assets, the source of down payments, whether homes are being flipped and resold rapidly. Those are all the types of representations that in a very real way decrease the creditworthiness of the borrower, and at the same time... Now, Mr. Shapiro, you're really asking for a much more narrow construction of the statute than we've been used to, at least. Certainly the other circuits have had some kind of a rationale for adopting the position they have. How would you characterize their collective rationale? I think it's best encapsulated in the most recent circuit to do so, which was the Tenth Circuit in the Sikenga case. And in Sikenga, the Tenth Circuit stated that it was expressly adopting proximate causation to narrow rather than enlarge the field of actions for which FCA liability may be imposed. The Tenth Circuit went on to emphasize that proximate causation strikes the proper analytical balance because we have a statute here in the FCA that's punitive, at least partially punitive in nature, based on the mandatory troubling of damages, and thus a strict construction of the statute, unless expressly provided otherwise in the statutory text, is necessary to protect against open-ended liability. And why do we privilege the narrowing construction? It seems to me Escobar charts a middle course. It rejects the idea that this implied false certification notion is always wrong. At the same time, it makes sure that there's a rigorous materiality requirement. It's a little bit of both, but it strikes me as kind of a middle ground. So why do you automatically jump to the narrowest possible? Doesn't Congress want to collect money when people make false claims to the U.S.? I don't believe that I am chartering the narrowest ground here. Well, you just said that's what the Tenth Circuit's rationale was in response to Judge Ripple's question, and so maybe I misunderstood you. I thought you were saying that we, too, should look for the very narrowest rule that we could find. What I would say that the guidance from Escobar that this Court should take away is that Escobar expanded when it recognized implied certification liability and things that have been rejected in some circuits before, that the realm of activity that can fall within the False Claims Act is a bit broader. So that's kind of a threshold, what has to happen in order for a claim to be made under the FCA. But you need to take a narrower approach before you're going to impose liability, in this case to the tune and excess of $10 million, based on a form that nobody considered with respect to a particular loan, and by the district court's own conclusion, there was no negligence or malfeasance here. The loans that would have defaulted would have done so, even if Mr. Luce's statements on the V-forms had been fully accurate. I see I'm in my Republican round. What I find very, I don't know, interesting isn't the right word. You know, you're characterizing the crimes that he was indicted for as, you know, unrelated, totally unrelated to the operation of MDR. But, of course, the V-form doesn't distinguish among crimes. And it certainly seems to me that crimes of dishonesty and fraud would be extremely relevant in the loan processing industry. Yes, Judge Roefner. And my response to that is that Mr. Luce's crimes, while they were unrelated to the industry, maybe they do fall within the scope and possibility of the V-form. And that was reason to take a regulatory action against him for sure. But to take the next step and to say that those forms can result in a liability in excess of $10 million, you have to have proximate causation. You have to look at whether any harm the government resulted was the reasonably foreseeable consequence based on the nature of the representations in the V-forms. By the way, did you present evidence in the form of affidavits or otherwise that Mr. Luce or others at MDR didn't file the V-form in 2006? We did not present affidavits. The evidence that we presented is that government witnesses were looking for the V-forms, they were asked about them, and after going through the record and investigating this, they found no V-forms for 2005 or 2006. I'll also note that in response to discovery, the government produced the V-forms for 07 and 08, but it also produced V-forms on summary judgment for 2003 and 2004 signed by Mr. Luce. I think that makes the absence of 05 and 06 all the more conspicuous, and we didn't mention the 03 and 04 forms in our brief, but they can be found in the appendix at pages 457 to 458. You can save your last minute, and if I'm feeling generous, I'll even give you more than that. So we'll see. Thank you, Judge Wood. Sure. Mr. Scarborough. May it please the Court. Charles Scarborough, Department of Justice for the United States. With me at council table is Kurt Lindland, who handled the case below from the U.S. Attorney's Office. This is a case in which Defendant Luce lied in order to obtain an important government benefit. He lied in the required forms, as you've already discussed, that are basically the first step of even getting into the program. So he lied to get into the program, but it does seem at least worth discussion that the measure of damages that the government sought was measured by the mortgages that defaulted and how much HUD wound up having to pay as a result of these guarantees. Trebled, of course. And I can see there's a big difference between $16,500 and $10 million, you know, if you've got the penalties that are so small. And it's of some concern whenever we're an outlier circuit. So why shouldn't there need to be a closer connection between his lies on the V forms and the measure of damages that you're looking for? Well, first, with regard to being an outlier circuit, I don't think you're nearly the outlier circuit that has been characterized previously. In Cicero itself, there were two circuits, the Third and the Fifth Circuit, that had adopted a proximate cause standard in the loan guarantee context. And that's really sort of in that context that these principles really are sort of you need to analyze them. Well, we adopted but for. I understand. That's my point. I'm leading up to you knew very well in Cicero in 1992 that you adopted but for. You actually had the procedure where you called for the court to think about whether it should go en banc. To think about whether it should, you know, disagree with the other circuits. And there was no call to do that. So in 1992, the court made a decision, in part because it recognized that cases like Hibb's had adopted an unduly restrictive standard here. Again, this is consistent with False Claims Act principles throughout. And I guess it is most consistent with the notion of promissory fraud. And that's a case or a principle that appears in cases like the Mayne case, which we've cited in our brief. And there, the court was very clear. When you use your Phase I false statements to gain entry and maintain your eligibility to be in the program, to get government subsidies of some sort, in that case it was Department of Education, Federal Student Loan Funds. When you do a false statement, there it was the false statement of promises of compliance with something called the Incentive Compensation Ban that's very important to the government. Judge Easterbrook had no problem with saying those false statements are integral to a causal chain leading to payment. And the payment, again, at the back end was in a variety of ways. You would either pay out student grants, funds, just straight out payments being made. Or sometimes you would be called upon, as in this case, to make up the difference on a defaulted student loan. And so the causation principle really is firmly embedded in the False Claims Act. And I think that, you know, this court, again, addressed it in Cicero. Chief Judge Wood, you recognize that Escobar has nothing to say about causation. All it does is drop a footnote that sort of mentions the well-established principle that, you know, we construe the False Claims Act against well-established common law principles. And it cites to a 1999 case, Nieder. So that's not a new principle. There's nothing new. There's no cause to be reevaluating Cicero. The two other cases that I think counsel was referring to that are sort of trying to characterize this as an outlier circuit are not loan guarantee cases. Kenga is a case about Medicare fraud, state laboratory, you know, sending bills. And actually the proximate causation discussion is very complicated. It actually rejects the defendant's more restrictive causation standard in favor of a proximate cause standard. It really, it has no bearing on sort of the loan guarantee context in which there are many different causes. And again, this court thought about all this in Cicero. In Cicero, you know, the district court had held that, well, the real cause here wasn't that you had lied, you know, on various forms to get SBA, the Small Business Administration, to get them to insure your loans. The real cause was this fire that burned down the car dealership. And this court said, no, like that's often going to be the case in a loan guarantee situation. So I take it, though, from the way you're presenting this argument that you would agree that this is maybe the pivotal question, that if we were to adopt a proximate cause standard after the appropriate procedures under Rule 40E or whatever else we might have to do, the government can't prove proximate cause. No, I don't concede that the government can't prove. We have a whole second part of our brief on proximate causation. I think that... I wasn't so sure about that.  Well, again, the district court, I'd like to quote from the district court at the appendix at page nine, note six, said it found that an experienced lawyer like Mr. Luce, who has extensive SEC background, would know that some mortgages would default and the government would turn to the principal responsible for falsifying the company's certification when mortgages originated defaulted. This all goes to the concept that this is all reasonably foreseeable. In fact, the intended result of getting into this program is to have yourself covered by the government. And, of course, there are going to be mortgage defaults. But that would imply that you don't need to know which mortgages are going to default. You just have to know that out of a pool of 1,000 mortgages, 100 will default or something like that. Well, I don't actually think you need to know a specific number that has to default. But, again, that's consistent with the notion of promissory fraud, which is well-embedded in the False Claims Act. In other words, when you secure a contract through fraud, to take a Supreme Court case, U.S. ex-rel Marcus v. Hess, which is from the 1940s, it's sort of a seminal False Claims Act case. When you use collusive bidding to get a contract that you shouldn't otherwise have, you are actually liable for all the claims that the government has to pay out there. The same principle is at work here. And I think the court understood all that in Cicero, that the False Claims Act has other limitations built into it that sort of restrict runaway liability that you might be worried about with a but-for causation standard. Most prominently, the fact that at the end of the day, you need to have a claim. You need to have the government being asked to pay for a default here. So we're not talking about limitless liability. And, again, I go back to the notion that there is normally a court when it calls for en banc reconsideration of a decision that's been around for 25 years, there's some cause for doing that. There is no cause here. Escobar just doesn't speak to that. Well, let me try this out on you. It seems to me that you could, at the next level of generality, you could see the Supreme Court being more aware of the need to put limits on various types of white-collar misbehavior, whether it's the Arthur Anderson case or whether it's the Skilling case or whether it's Escobar, you know, with taking the materiality requirement seriously. The court is, I think, rightly concerned about these very open-ended laws that, without some careful limitations found within the laws, perhaps because of their common law background or for whatever reason, maybe in the criminal area, the principle of lenity. The court's saying, you know, don't just run with these things. And so from that point of view, maybe there is a reason to reconsider Cicero. Well, that's a very high level of generality. First of all, it's not a criminal case, so there's no rule of lenity situation here. And I think that, but responding specifically about Escobar. But it's a trend. You would agree that you can find Supreme Court cases that all move in that direction. You can certainly find Supreme Court cases to support that notion. But I would sort of go to Escobar and the court's most recent thinking about the False Claims Act. And, I mean, that validated the implied certification theory. Right. It was a huge win for the government. It was an important case, an important theory, the notion that if there is anything false on the face of a claim, that that can nevertheless be deemed a false or fraudulent claim if you're not disclosing some antecedent violation that is important. And what the Court said in the Supreme Court. Barbara. Yes. Finish your thought, and then I want to ask you a very specific question.  What I was getting to is that what the Supreme Court said in adopting what the defendant said was going to be a catastrophically broad theory, this implied certification theory. Defendants have been arguing that for the past decade. Was, no, there are limiting principles, again, built into the False Claims Act. The key ones being the knowledge element and the materiality element. And so the second half of Escobar is about materiality and about how you determine materiality. Didn't change the standard, but it pointed to the fact that materiality is a limiting principle to prevent you being held liable for treble damages for things that don't actually matter to the government. But this is not such a case. This is something where it is front and center that it matters to the government. Judge Rovner, I'm sorry. The V-Forms specified that they applied for the preceding fiscal year. Wouldn't that be evidence that the certification was not material to the decisions to make the loans for that year and to allow MDR to process them? Because the certification came only at the end of the year. Well, Your Honor, I think it's important to understand that these are annual certifications. So you're just basically trying to make sure that you're dealing with a loan correspondent that has the proper integrity to be sort of your outward-facing agent, collecting the proper material from the borrowers and getting accurate material to the lenders. As you know, the district court spent considerable time thinking about whether it's a backward-facing certification or a forward-facing and ultimately decided that it was a certification that was prospective. We don't think that's entirely right, but it had the net effect. The district court had the net effect of limiting, compressing the liability for the defendant. I mean, the district court did a lot of things that in some respects limited the liability and was very careful, for instance, to say that it couldn't give a summary judgment on the loan-specific forms, the 92900A forms. And while we're not here to litigate the 92900A forms, it's important that they required the same certification, the same lack of disqualifying criminal history certification on loan-specific documents, further amplifying the notion that this is something that matters to the government. It's essential to the government. Mr. Scarborough, precisely what is the legal liability of someone in Mr. Luce's position if there's a default on the loan? Is he liable under law for repayment? If he's falsely certified, if he's basically used fraud to get into the program, yes, he's liable. Under what provision of the law? Under the False Claims Act because he's used a false statement. That's the only liability is the one you're asserting now. Yes, Section 3729 of the statute. There's no specific statutory provision that makes him liable for a defaulted loan initiated through his organization. Maybe I'm misunderstanding. It's a general provision of the False Claims Act, using a false statement material to a false or fraudulent claim. It's well established. That's circular here. Is that make him liable? Yes, Your Honor. Again, the false statement is the front-end statement on the V form. This is, again, it's a commonplace. It's similar to the main situation. What I'm hearing from you is this is the way we all do it, but I'm not seeing anything in the statute. You said that you could fulfill the proximate cause. Well, the statute, okay, so I guess there's two parts to your question here. I was going to the liability provision, which is 3729A. A1A or A1B are both in play here. A1B is more relevant. It's using a false statement material to a false or fraudulent claim. We think that's a textbook case of what has happened here. It can also be referred to as the promissory fraud theory. You obtain entry into a program that you are not otherwise eligible for because you have disqualifying criminal indictments pending, and then you are then liable for what happens to the government's losses thereafter, as in the main case, as in the Rogin case. In the Rogin case, which we cite in our brief, the disqualifying thing was the payment of kickbacks that resulted in Medicare claims. So doesn't it all hinge on there's a false or fraudulent claim. The government pays on that claim. Yes. And if the person on the capital B part has made a false statement material to that claim, that's where the liability gets triggered. Yes, Your Honor. So maybe I was overcomplicating my response, but it is the literal provisions of the False Claims Act that make him liable here. Again, that's a relatively common thing that this Court has recognized in lots and lots of cases. The Maine case in particular uses the language, integral to a causal chain leading to payment. That's the precise language from Maine. The Rogin case, again, it deals with a violation of an express condition of payment and participation, which is the government doesn't pay for kickback-tainted claims. You don't ask sort of, you know, is each of these claims tainted by kickbacks? You say, well, you can't be in the program in the first instance. And that's, again, very commonplace. Regarding the 2006 V form, you have evidence of the corresponding certification, the certification payment that MDR made that year, which would have accompanied the form from which a jury could infer that the form was filed, you know, with the same misrepresentation. But couldn't a jury also choose not, you know, not to draw that inference? Is that, I guess what I'm getting at is, is that determination really appropriate for summary judgment? Yes, Your Honor, because it's not just the recertification evidence that you refer to that we have in the record. It's also the testimony of Julie Schaefer, who said that you wouldn't have been able to participate, you wouldn't have been in the program at all had you not had a V form on file. And it's also, as the district court explained, the complete absence of testimony from Mr. Luce that he didn't file a V form. And, again, you have V forms both before and after that are signed by Mr. Luce. There's just no plausible evidentiary basis from which a jury could decide, oh, you know, despite the long stream of Mr. Luce signing these V forms, you know, he didn't do it in 2006. And, again, the district court was very careful about not overreaching on summary judgment. The district court didn't give a summary judgment on the 92900A forms because it found that there was a jury question about knowledge. I mean, we think that if we were to go back, we'd be able to prove knowledge in spades. But this was not a sloppy district court decision. This was something that the district court really thought about these issues and gave a summary judgment because there was no plausible basis for a jury to conclude that there was no 2006 form on file. I see that my time is up. It's awfully close to 2005. I'm sorry? 2006 was very close to 2005. Maybe, you know. Your Honor, I guess, again, I just would go back to the fact that there is no countervailing evidence. There's a dog that is not barking very loudly here, and that's Luce not testifying that he didn't file a 2006 form. The district court looked at this issue carefully, and we do think there's enough to support, you know, finding that there was a 2006 form on file and liability. So we'd ask that the district court's judgment be affirmed in its entirety. Thank you, Your Honor. All right. Thank you. Mr. Shapiro, I'll give you two minutes to respond. Thank you, Judge. Just a couple of quick points, obviously. First, I'd like to point out that the distinction the government seeks to draw between First National Bank of Cicero involving, you know, an insured loan context and the Sikenga case involving Medicare really isn't relevant to the pure question of law of what causation standard applies under the False Claims Act. Under either of those situations, it's what does the statute provide, and following Escobar, what does the Supreme Court have to say about common law principles applying? But there's not a different causation standard based on different underlying conduct for the False Claims Act. So what about the government's backup theory that they knew out of, I'm just going to make these numbers up, out of every thousand loans, you know, some percentage, maybe 10%, would default. So if you're going to be participating in the program, you're going to be going to the government hat in hand for this money. Well, first off, Mr. Lewis never went hat in hand, nor did MDR. Well, the borrowers, you know, whoever. The actual lenders would be going hat in hand. The lenders got paid. What I would say to that judge is that when you're looking at proximate cause in the fraud context as applied by the common law historically, it's not just that losses were reasonably foreseeable. It's that losses were reasonably foreseeable based on the specific character or nature of the representation at issue here. But why can't you meet that standard here? You know, the representation is, you know, I'm clean as a whistle. You know, let me be in the program. And as soon as you're in the program, some number of the loans you present to the government will default. Well, as we point out, over 95% of the loans to government was already on the hook for as an insurer before the refinancing that MDR did as a company affiliated with Mr. Lewis. But more than that. And you said also, didn't you, that the interest rates always went down, that these were refinances? The monthly payments always had to go down when there was a refinance of a loan. And I think everybody would agree, even the government, that if a monthly payment is lowered, the risk of default is lower as well, and thus the risk that they would have to pay on the insurance. I see my time's expired. I thank the court for its time, and we ask that the district court be reversed. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.